# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF FLORIDA
### PENSACOLA DIVISION

**UNITED STATES OF AMERICA**

**v.**                                    **CASE NO. 3:24cr11/MCR**

**DANIEL R. McCAFFREY**

_____/

## <u>OMNIBUS ORDER</u>

Defendant Daniel R. McCaffrey is charged with (1) transportation of child pornography, (2) possession of child pornography, (3) aggravated sexual abuse, and (4) abusive sexual contact.  In particular, the Government alleges that McCaffrey sexually abused Minor Female 1 ("MF1"), then a four-year-old girl.[1]  The Government has filed two motions *in limine*, and McCaffrey has responded to one.  ECF Nos. 36, 37, 42.  Trial is scheduled to commence on July 31, 2024.

---

[1] Although the Government states she was five at the time, *see* ECF No. 36 at 2, this appears to be a mistake.  First, MF1 stated in two forensic interviews taken soon after her disclosure of the alleged abuse that she was four years old.  Second, the Government states that MF1 will be seven years old at the time of trial.  *Id.* at 11.  MF1 made her disclosure in March 2021, which is three years ago, making her four years old at the time.  Third, a report by the Okaloosa County Sheriff's Office states that MF1 was four years old.

## Motion *in Limine* 1 (ECF No. 36)

The Government seeks to admit prior statements made by MF1 in two forensic interviews dated April 23, 2021, and July 27, 2021, under (a) Federal Rule of Evidence 807 in the event that MF1, now seven years old, becomes anxious or intimidated on the witness stand such that she is unable to testify effectively in court, and (b) Rule 801(d)(1)(B)(ii) as prior consistent statements in the event McCaffrey attacks MF1's credibility or memory on cross-examination.  The Government also asks that MF1 be allowed comfort items while testifying due to her young age.

### I.      Admission Under Federal Rule of Evidence 807

The Government's request to admit MF1's statements under Federal Rule of Evidence 807, also known as the residual hearsay exception, raises two issues:  First, whether the statements are admissible under Rule 807, and second, if so, whether their admission violates the Confrontation Clause of the Sixth Amendment to the United States Constitution.

### A. The Forensic Interviews

In March 2021, United States Air Force ("USAF") Servicewoman Vanessa McCaffrey reported to USAF Office of Special Investigations ("OSI") on Eglin Airforce Base that she observed MF1 engaging in behavior that appeared to replicate

masturbating.[2]  On or around March 30, 2021, the Okaloosa County Sheriff's Office

(the "OCSO") initiated an investigation into McCaffrey for possible child abuse.

The OCSO report dated April 2, 2021, states that "[t]he other day, [MF1] went into

the mother's room and laid next to her in the bed.  [MF1] put her fingers in between

her legs and began to hump them.  The mother asked [MF1] to stop multiple times

and she continued to do it.  The mother walked out of the room and [MF1] followed

behind her crying.  [MF1] said to the mother, "[McCaffrey][3] did this to me, mommy

please help me with [McCaffrey]."  ECF No. 42-1 at 2.[4]  On or around April 2, 2021,

Investigator Ashton Marie Hatch of the Department of Children and Families

("DCF") interviewed MF1 in a child-friendly interview room.  During the interview,

MF1 did not disclose any sexual abuse of her by McCaffrey.[5]  The Government does

not seek to admit this interview.

---

[2] The family lived on Eglin Airforce Base in Northwest Florida.

[3] McCaffrey's name is substituted for the moniker used by MF1 to refer to McCaffrey to protect against the public revelation of the nature of the relationship, if any, between McCaffrey and MF1.

[4] The Government states that MF1's mother saw her "engaging in . . . masturbatory-type behavior, and MF1 said, '[McCaffrey] did this to me.'"  ECF No. 36 at 2.

[5] Contrary to McCaffrey's characterization of this interview, MF1 did not deny that McCaffrey had sexually abused her.  The notes state that "[d]uring our interview, [MF1] never disclosed what . . . McCaffrey did to her.  We were able to ascertain that [MF1] does not like [McCaffrey], is scared of him and does not miss him when he is gone."  ECF No. 42-1 at 2.  There is no denial.

On April 23, 2021, MF1 was interviewed by Cheryl Canipe, a member of the Emerald Coast Children's Advocacy Center's Child Protective Team trained in conducting forensic interviews of abused children. The Government seeks to admit this interview. Many of MF1's statements during this interview are unintelligible due to a speech impediment or delay; however, some of her statements can be understood:

> 00:10:52
> MF1: I don't like [unintelligible] [McCaffrey].
> Canipe: You don't like to – you don't like what with [McCaffrey]?
> MF1: I don't like him, he's not good.
> Canipe: How come?
> MF1: 'Cause [McCaffrey] is mean.
> Canipe: How is [McCaffrey] mean?
> MF1: 'Cause him is not good.
> Canipe: What does he do that's not good?
> MF1: A shot.
> Canipe: What?
> MF1: A shot.
> Canipe: I don't know what that means.
> MF1: 'Cause [McCaffrey] [unintelligible] like [points at her arm].
> Canipe: Are you pinching?  What happened there?
> MF1: 'Cause [unintelligible] three four five six shots.
> Canipe: Yeah?
> MF1: Like [McCaffrey] give me one two three four shots.
> Canipe: Are you saying shots?
> MF1: Yeah, [McCaffrey] [unintelligible] give me shots.
> Canipe: How does [McCaffrey] give you shots?
> MF1: [unintelligible]
> Canipe: Say that one more time?
> MF1: [unintelligible] [McCaffrey] give me shots.
> Canipe: Where does he give you shots?

MF1: Right here [points at her arm].

Canipe: Right there?

MF1: Yeah.

Canipe: What did he use to give you a shot?

MF1: [unintelligible] right here [points at her arm].

Canipe: Yeah?  With what?

MF1: [motions with one arm wrapping something around the other]

Canipe: Wrapped it around?

MF1: Mmm-hmm

Canipe: Mmm-hmm?  What did that feel like?

MF1: It feel not good.

Canipe: Not good?

MF1: Yeah.

. . . .

00:18:33

MF1: [McCaffrey] is being mean.  [McCaffrey] is being not good.

Canipe: Okay so tell me, and you said [McCaffrey] and you talked really slow and I understood that.  Tell me what [McCaffrey] does that's not good.

MF1: [McCaffrey] [unintelligible] like [points at drawing she made on paper].

Canipe: What's that?

MF1: [McCaffrey] puts that [unintelligible].

Canipe: [McCaffrey] puts that on what?

MF1: [McCaffrey] [unintelligible] my butt.

Canipe: What's that?

MF1: [McCaffrey] [unintelligible] he put it in my butt.

Canipe: [McCaffrey] does it in your butt?

MF1: [nods]

Canipe: What does [McCaffrey] do to your butt?

MF1: [McCaffrey] puts it in my butt.

Canipe: What does he put in your butt?

MF1: A shot.

Canipe: A shot?  Yeah?

MF1: Yeah.

Canipe: What does that feel like?

MF1: Feels bad.

. . . .

00:30:00

CASE NO. 3:24cr11/MCR

[Canipe is showing MF1 an anatomical picture of a female body]
Canipe: And is there anywhere on your body that it's not okay for someone to touch?
MF1: [McCaffrey].
Canipe: [McCaffrey]?
MF1: Hmm.
Canipe: What do you mean by that?
MF1: [unintelligible]
. . . .
00:34:16
[Canipe is showing MF1 an anatomical picture of a male body]
Canipe: Where is—where does [McCaffrey] have the shot?
MF1: Like [points to a part of the picture]
Canipe: His hand.  Okay.
. . . .

ECF No. 36-1.

MF1 was interviewed by Cheryl Canipe again on July 27, 2021, after receiving speech therapy.   The following exchanges from this interview are intelligible:

00:05:04
Canipe: Tell me about [McCaffrey].
MF1: [McCaffrey] put a [unintelligible] in my private.
Canipe: [McCaffrey] did something to your private?
MF1: Yeah, he put a shot in my private.
Canipe: He put something in your private?
MF1: A shot.
Canipe: You saw it?  What did [McCaffrey]—
MF1: [shakes her head]
Canipe: Okay.  A shot?
MF1: [nods]
Canipe: A shot.  Where did he get the shot?
MF1: At the doctor's.

CASE NO. 3:24cr11/MCR

Canipe: At the doctor's?

MF1: [nods]

……

00:07:43

Canipe: Did [McCaffrey] do anything else with the shot?

MF1: No. [shakes her head]

Canipe: No.  Okay.  What did it look like?  Can you draw me a picture?

MF1: [draws picture]

Canipe: Okay.  Did [McCaffrey] do anything else to your private?

MF1: Yeah.

Canipe: Yeah?  What else did [McCaffrey] do to your private?

MF1: [draws, does not respond verbally, points at the paper]

Canipe: What's that?

MF1: [McCaffrey].

Canipe: [McCaffrey]?  Okay.  So you said [McCaffrey] did something else to your private.  What did [McCaffrey] do?

MF1: [draws, does not respond verbally]

Canipe: So you said that [McCaffrey] put a shot in your private?

MF1: Yeah.

Canipe: Yeah.  Did [McCaffrey] touch your private with anything else?

MF1: Yeah.

Canipe: What's that?

MF1: [draws, unintelligible]

Canipe: Okay.  I didn't understand that.  Could you say that again?

MF1: [draws]

. . . .

00:12:36

Canipe: You told me that he put a shot in your private?

MF1: [nods]

Canipe: Um.  Did he ever put anything else in your private or touch your private with anything else?

MF1: [unintelligible]

Canipe: Remember to put your tongue in the middle.[6]

MF1: [unintelligible] with his hand.

Canipe: With his hand?

---

[6] This is speech therapy guidance for MF1.

MF1: [gestures]

Canipe: I want to make sure I heard you right.  You said he put a shot in your private and he touched it with your hand.  Is that what you said?

MF1: [nods]

. . . .

00:16:41

Canipe: So you told me that [McCaffrey] touched your private with his hand.

MF1: [nods]

Canipe: What was he doing with that hand?

MF1: [draws] like this.

Canipe: I didn't understand that.

MF1: Like this [draws]

Canipe: Like that?  So did he touch the inside or the outside of your body?

MF1: Inside.

Canipe: Inside?

MF1: Yeah.

Canipe: And what part of his hand did he use to touch the inside of your body?  Can you show me?

MF1: [draws]

Canipe: Can you show me with your hand?

MF1: [puts her hand over her genitals with fingers pointing downward] Like this.

Canipe: Like that?

MF1: [nods]

Canipe: You were putting your hand over your private?

MF1: [nods]

Canipe: And was he touching the outside or the inside of your private?

MF1: Inside.

Canipe: What did that feel like?

MF1: Bad.

Canipe: Did that happen one time or more than one time?

MF1: Um.  One time.

. . . .

00:19:05

Canipe: So is there anywhere else on your body that [McCaffrey] touched?

MF1: [Points to a body part on an anatomical picture].

Canipe: What do you call that?

MF1: A butt.
Canipe: Okay.  And did [McCaffrey] touch you there?
MF1: [nods]
Canipe: What did he touch you there with?
MF1: A shot.
......
00:21:30
MF1: [McCaffrey] put something else in my private.
Canipe: Thank you, you said that so I could hear it.  I appreciate that.  What else did he put in your private?
MF1: His hand.
......
00:22:08
Canipe: Did he want you to do anything with your mouth?
MF1: [nods]
Canipe: What did he want you to do with your mouth?
MF1: Put a shot in my mouth.
Canipe: Put your tongue in the middle so I can hear you.
MF1: Put a shot in my mouth.
Canipe: Put a shot in your mouth?
MF1: [nods]
Canipe: What did that shot look like?
MF1: White.  It's white.
Canipe: His what?
MF1: It's white.  Like [points at paper].
Canipe: Oh, it's right like you drew on here for me?
MF1: [nods]
Canipe: Did he ever do anything with his mouth?
MF1: [nods]
Canipe: What did he do with his mouth?
MF1: Um.  Put a shot in his mouth.
Canipe: He put a shot in his mouth?
MF1: [nods]
Canipe: Okay.  What did he do with the shot after he put it in his mouth?
MF1: Um.  [does not respond]
. . . .
00:35:54

MF1: [McCaffrey] did that.
Canipe: [McCaffrey] did that?  What did [McCaffrey] do?
MF1: He put um— [McCaffrey] was mean to me.
Canipe: [McCaffrey] was mean to you?  Yeah?  What did [McCaffrey] do that
was mean to you?
MF1: He put a shot in my private.
Canipe: He put a shot in your private.  Okay.

ECF No. 36-1.

### A. Rule 807

Federal Rule of Evidence 807, the residual hearsay exception, provides that

a hearsay statement is not excluded by the rule against hearsay even if
the statement is not admissible under a hearsay exception in Rule 803
or 804 [if]: (1) the statement is supported by sufficient guarantees of
trustworthiness—after considering the totality of circumstances under
which it was made and evidence, if any, corroborating the statement;
and (2) it is more probative on the point for which it is offered than any
other evidence that the proponent can obtain through reasonable efforts.

Fed. R. Evid. 807(a).  "Congress intended the residual hearsay exception to be used

very rarely, and only in exceptional circumstances."  *Rivers v. United States*, 777

F.3d 1306, 1312 (11th Cir. 2015) (citation omitted).  "Courts have employed the

[residual hearsay] exception most extensively in admitting statements made by child

witnesses, particularly in sexual abuse cases." 2 McCormick on Evid. § 324 (8th ed.

updated July 2022); *see United States v. White Bull*, 646 F.3d 1082, 1094 (8th Cir.

2011) ("such exceptional circumstances generally exist when a child victim of

sexual abuse is unable or unwilling to testify to a material issue regarding the abuse"
(citation omitted)).

### (i) Trustworthiness

Although there is no doubt that child sexual abuse is an exceptional
circumstance for which Rule 807 may be employed, *see id.*, the residual hearsay
exception may be utilized "only when certain exceptional guarantees of
trustworthiness exist and when high degrees of probativeness and necessity are
present." *Rivers*, 777 F.3d at 1312 (quotation mark and citation omitted). "The rule
speaks in terms of guarantees; '[a] suggestion of trustworthiness cannot suffice.'"
*United States v. Burgess*, 99 F.4th 1175, 1183-84 (10th Cir. 2024) (citation omitted).
To assess trustworthiness, the Rule requires courts to consider "the totality of
circumstances under which [the hearsay statement] was made and evidence, if any,
corroborating the statement." Fed. R. Evid. 807(a).[7]

Several courts have discussed the circumstances courts should consider when
assessing the trustworthiness of out-of-court statements by children about sexual

---

[7] Rule 807 was amended effective 2019 to "specifically require[] the court to consider
corroborating evidence in the trustworthiness enquiry." Fed. R. Evid. 807 advisory committee's
note to 2019 amendment. The Advisory Committee explained that "the existence or absence of
corroboration is relevant to, but not dispositive of, whether a statement should be admissible under
this exception. Of course, the court must consider not only the existence of corroborating evidence
but also the strength and quality of that evidence." *Id.*

abuse.  For instance, when upholding the admission of statements made by a ten-year-old child in a forensic interview at a Children's Advocacy Center, the Eighth Circuit considered

> the training and experience of the interviewer; whether the child was interviewed using open-ended questions; the age of the child and whether the child used age-appropriate language in discussing the abuse; the length of time between the incident of abuse and the making of the hearsay statement; and whether the child repeated the same facts consistently to adults.

*United States v. Thunder Horse*, 370 F.3d 745, 748 (8th Cir. 2004) (citation omitted); *see also United States v. Smith*, No. CR 19-324 (BAH), 2020 WL 5995100, at *7-12 (D.D.C. Oct. 9, 2020) (applying the *Thunder Horse* factors and ruling on motion *in limine* that thirteen-year-old child's forensic interview regarding sexual abuse had sufficient guarantees of trustworthiness under Rule 807).  The *Thunder Horse* court noted that "[n]o single factor is dispositive; we examine the factors to determine if there are sufficient positive signs of trustworthiness."  370 F.3d at 748 (citation omitted).

Similarly, when upholding the admission of a recorded forensic interview of a seven-year-old child at a Safe Harbor Victim Center, the Tenth Circuit considered whether the interview occurred close in time to the alleged abuse, whether a trained interviewer used open-ended questions during the interview, whether the interview

statements were consistent with other statements made by the child, whether the child used child-like terms to explain the events, what level of detail the child used to describe the abuse, whether the child had a motive to lie, and the age of the child. *Burgess*, 99 F.4th at 1183-84.

Another court considered the spontaneity of the child's statements, the child's affect when making the statements as compared to his usual affect, and consistency in the core details of statements repeated numerous times to numerous people, including during interviews with professionals. *See Doe v. Darien Bd. of Educ.*, 110 F. Supp. 3d 386, 398-401 (D. Conn. 2015) (determining that hearsay statements of 12-year-old boy with Down Syndrome regarding sexual abuse by his school aide will likely be admissible at trial under Rule 807); *see also United States v. Wandahsega*, 924 F.3d 868, 881 (6th Cir. 2019) ("The Supreme Court listed the following factors as particularized guarantees of trustworthiness in the context of child sexual abuse: '(1) spontaneity; (2) consistent repetition; (3) the mental state of the declarant; (4) the use of terminology unexpected of a child of similar age; and (5) the lack of a motive to fabricate.'" (quoting *Stuart v. Wilson*, 442 F.3d 506, 522 (6th Cir. 2006) (citing *Idaho v. Wright*, 497 U.S. 805, 821-22 (1990)))).

The Government argues that MF1's statements to Canipe contain sufficient guarantees of trustworthiness for admission under Rule 807. In support, the

CASE NO. 3:24cr11/MCR

Government first states that Cheryl Canipe has worked as a Child Protection Team forensic interviewer in Niceville, Florida, since 2014. She is a registered nurse, having obtained her Bachelor of Science in Nursing in 1985, has completed specialized training in the field of forensic interviewing, and, importantly, has conducted over 600 forensic interviews. ECF No. 36 at 8. The Government adds that Canipe was a stranger to MF1 and had no motive to manipulate the evidence. *Id.* The Government further argues that Canipe used open-ended questions, that the interviews occurred shortly after the alleged abuse and MF1's alleged disclosure of it, and that MF1's statements are consistent across both interviews, with the July interview simply including more detail. The Government argues that these facts, combined with MF1's young age, support the trustworthiness of her statements.

McCaffrey disputes the trustworthiness of the interview statements. First, he notes that a full month passed between MF1's alleged disclosure to her mother on March 22, 2021, and the April 23, 2021, interview. He adds that in between the alleged initial disclosure and the first interview, MF1 was questioned about and discussed the disclosure with several adults, including her mother, her grandmother, Investigator Hatch and other DCF workers, and OCSO officers. McCaffrey further argues that the first interview is "nonsensical," that Canipe did not ask entirely open-ended questions, that her objective of having MF1 say that McCaffrey improperly

touched her is clear, and that MF1 did not pass basic truth and lie questioning, as displayed in the interchanges between Canipe and MF1 at the beginning of each interview.

As an initial matter, the Court disagrees with McCaffrey's argument that the introductory questions show that MF1 did not distinguish between truth and lies.  At the beginning of the first interview, Canipe and MF1 had the following exchange:

> Canipe: How old are you?
> MF1: [holds up four fingers]
> Canipe: Four years old!  That's such a big girl.  What do you like to do?
> MF1: [pauses, holds up four fingers]
> . . . .
> Canipe: If I ask you a question more than one time, you didn't get the wrong answers.  With my old brain, I forgot, sometimes that happens.  Okay?  Yeah.  And if I say something I get it wrong, like if I said, '[MF1], you told me you were two,' what would you say?
> MF1: [holds up four fingers, then puts down two fingers]
> Canipe: I want you to say, 'Ms. Cheryl, I'm four, [MF1 holds up four fingers] I told you I was four, okay?'  In this room you have my permission to correct me, okay?
> MF1: [smiles]

ECF No. 36-1.  In the beginning of the second interview, Canipe and MF1 had a similar exchange:

> Canipe: Tell me what your name is.
> MF1: [states her first name]
> Canipe: [MF1 first name?]  What's your whole name?
> MF1: [holds up four fingers]
> Canipe: You're four years old?  Yeah?  Tell me what you like to do.
> . . . .

Canipe: If I ask you a question more than one time, it's not that you gave the wrong answers, with my old brain, I forgot.  Sometimes that happens.  Because I'm kind of old.  All right?  And if I say something, like if I said, '[MF1], you told me you were two years old,' what would you say?
MF1: [silent]
Canipe: I want you to say, 'Ms. Cheryl, I told you I was four.'  You have permission in this room to correct me, I want to make sure I understand what you're telling me, okay?
MF1: Okay.
. . . .
Canipe: Did [McCaffrey] used to live with you?
MF1: [shakes her head][8]

*Id*.  MF1 clearly held up four fingers when asked to correct Canipe's statement that she was two years old and put down two fingers a moment after.   Moreover, MF1 corrected Canipe at several points during the interviews.  For example, in the first interview, MF1 corrected Canipe at least three times:

00:27:45
MF1: [draws]
Canipe: What's that?
MF1: [unintelligible]
Canipe: [McCaffrey] gave a shot on your mommy?
MF1: No. [unintelligible] on my mommy.

00:33:00
[Canipe places an anatomical picture of an adult male on the table before MF1]
Canipe: If this were [McCaffrey], where would he have the shot?
MF1: That's not [McCaffrey].
Canipe: I know that's not [McCaffrey].  We're just pretending.  But if it was [McCaffrey], where would the shot be?

---

[8] It is undisputed that McCaffrey used to live with MF1.

> 00:54:10
> MF1: [unintelligible]
> Canipe: Did you say [McCaffrey] covers– hides you with a cover?
> MF1: No.

*Id*.  Additionally (and importantly), MF1 was willing to state when she did not know

something (rather than make something up, as some children do):

> April 23, 2021, interview at 00:29:38
> [Canipe is showing an anatomical picture and asking MF1 to name body parts]
> Canipe: What's this?
> MF1: Um.  I don't know.
> Canipe: And if I told you if there's something that you don't know or don't
> remember just tell me, that's not a problem.

*Id*.  Thus, the interviews show that MF1 had a grasp of the difference between truth

and lies.

Applying the various factors and considerations proposed by courts to the

facts of this case, the Court finds that MF1's statements during the forensic

interviews contain sufficient guarantees of trustworthiness under Rule 807.

Canipe's training and experience weigh in favor of the trustworthiness of the

interview process.  Having watched both interviews in full, the Court concludes that

Canipe used almost exclusively open-ended questions, her questions were not

suggestive, and she had no clear objective to elicit a statement that McCaffrey

improperly touched MF1.  McCaffrey's transcriptions of portions of the interviews

contained in his Response describe Canipe as "visibly frustrated" and "visibly shak[ing her] head in disbelief." ECF No. 42 at 6. The Court disagrees with these characterizations of Canipe's demeanor. On the contrary, Canipe did an excellent job interviewing this four-year-old child with a speech impairment while asking only a very minimal number of leading questions, which would be necessary to interview any child that age.

Additionally, the Court notes that MF1 was four years old at the time of the interviews. She used age-appropriate language, such as "privates" and "butt." Although she frequently became reticent when asked for details about the alleged abuse, she conveyed a consistent core account across both interviews and her disclosure to her mother. Specifically, McCaffrey put a "shot" in or on her "butt" and "privates" while she was in her house with McCaffrey and her mother was at work and McCaffrey touched her "privates." *See Darien Bd. of Educ.*, 110 F. Supp. 3d at 399 (admitting hearsay statements by twelve-year-old child with Down Syndrome regarding sexual abuse despite "minor inconsistences" in his story); *Doe v. United States*, 976 F.2d 1071, 1079 (7th Cir. 1992) ("[I]t is to *overall* consistency that we look, not constancy with regard to each and every detail."). Additionally, during the July interview, MF1 physically gestured to show Canipe how McCaffrey

touched her genitals with his hand, which is consistent with the masturbating action MF1 showed her mother during her first disclosure.

These acts or gestures are ordinarily outside the scope of a four-year-old's knowledge.  *See Wandahsega*, 924 F.3d at 882 (upholding admission under residual hearsay exception of six-year-old child's spontaneous statement that he and his father "did PK" "just like dad and his girlfriend do" because it was spontaneous and used terminology ("PK") unexpected of a child that age); *Morgan v. Foretich*, 846 F.2d 941, 948 (4th Cir. 1988) ("All of the statements offered by plaintiffs were made before Hilary was four years old, and it is virtually inconceivable that a child of this age would have either the extensive knowledge of sexual activities or the desire to lie about sexual abuse that would be required to fabricate a story such as the one told by Hilary.").  Likewise, MF1's description of McCaffrey taking "bad" nude photographs of her is also outside the scope of a four-year-old's knowledge.

MF1's young age also weighs against the possibility that she fabricated the story.  Although McCaffrey argues that MF1 spoke with several adults about the alleged abuse between the initial disclosure and her first interview and it is true that MF1 stated both in the forensic interviews and in her interview with Investigator Hatch that she dislikes McCaffrey, and the parties agree that MF1's mother asked McCaffrey to leave their shared home, it is highly unlikely that a four-year-old child

would have the knowledge and capacity to manufacture a lie about sexual abuse based on her dislike of an individual. *See, e.g.*, *Burgess*, 99 F.4th at 1184 (seven-year-old unlikely to lie about child abuse due to her age); *United States v. Harrison*, 296 F.3d 994, 1006 (10th Cir. 2002) (upholding admission of fourteen-year-old's statement to law enforcement about sexual abuse by her father, even though her father physically abused her mother and the child may have wanted him removed from the home, because statement was made spontaneously after the father had been removed from the household); *United States v. Dorian*, 803 F.2d 1439, 1445 (8th Cir. 1986) ("[A] declarant's young age is a factor that may substantially lessen the degree of skepticism with which we view [her] motives." (citation omitted)).

McCaffrey also argues that the delay between MF1's initial disclosure of the alleged abuse in March 2021 and the second interview in July 2021 detracts from the trustworthiness of the interview statements. The Court disagrees. The consistency of MF1's core account across both interviews mitigates the concerns about the time lag. Also, the time delay does not reflect a bad faith motive to coach MF1; rather, MF1 received speech therapy during that time. The difference in her speech between the April 2021 and July 2021 interviews is significant. And, moreover, courts have concluded that interviews taken even a month and a half after an initial disclosure are admissible. *See White Bull*, 646 F.3d at 1091-92 (upholding

admission of note written in presence of forensic interviewer fifty days after the initial disclosure); *Thunder Horse*, 370 F.3d at 746 (upholding admission of forensic interview taken seventeen days after initial disclosure).

McCaffrey also argues that MF1's statements that McCaffrey is a "mean mutt" (July 27, 2021, at 00:20:12) and that "my family is mad at my mommy" (April 23, 2021, at 00:47:50)[9] suggest that MF1's statements were influenced by an adult. While it is hard to imagine that MF1 did not discuss the alleged abuse with her mother and grandmother during the spring and summer of 2021, and while the Court agrees with McCaffrey that MF1's description of him as a "mean mutt" reflects the possibility that her statements were informed by some of those conversations, it is equally hard to believe that an adult would coach a child to make a false statement regarding sexual abuse involving a "shot" in her private parts.

McCaffrey also highlights that there is no corroborating physical evidence that MF1 was sexually abused by him. The Court recognizes that there is no physical evidence corroborating MF1's account of the abuse, but "Rule 807(a)(1) does not require there [to] be evidence to corroborate the hearsay statements. The rule only

---

[9] McCaffrey also argues that MF1 stated that "my mommy kicked [McCaffrey] out of the house." ECF No. 42 at 7. At the Court's request, McCaffrey informed the Court that this can be heard in the in the April 23, 2021, interview at 00:06:34, but the Court cannot understand what MF1 said in that portion of the interview.

CASE NO. 3:24cr11/MCR

requires a court to consider corroborating evidence 'if any,'" which the Court has done.  *Burgess*, 99 F.4th at 1185.  Indeed, MF1's account is corroborated by the fact that an SD card[10] found in her room contains photographs of child sex abuse apparently similar to the abuse she described and her consistent disclosure of abuse to her mother.  Also, her statements in the second interview that McCaffrey took "bad" photographs of her with her clothes removed is corroborated by the presence of child pornography as well, even though the SD card apparently does not contain photographs of MF1.[11]

In sum, the Court finds that MF1's age and the consistency of her statements guarantee the trustworthiness of the hearsay interviews.  "The fundamental question, [under Rule 807], is not the trustworthiness of the witness reciting the statements in court, but of the declarant who originally made the statements."  *Rivers*, 777 F.3d at 1313.  The Court finds that MF1, as a declarant, is trustworthy.

---

[10] An SD card (secure digital card) is a removable storage device used to store and transfer digital data, commonly used in devices such as digital cameras, smartphones, and tablets.  *See* Lenovo, What is a secure digital (SD) card?, https://www.lenovo.com/us/en/glossary/sd-cards/, (last visited July 10, 2024).

[11] It is difficult to consider the "strength and quality" of the corroborating evidence outside of trial, and the Court recognizes that McCaffrey disputes both that MF1 disclosed any abuse to her mother and that the photographs are similar in nature to the alleged abuse.  Fed. R. Evid. 807 advisory committee's note to 2019 amendment.  However, even without this corroborating evidence, the Court finds MF1's forensic interviews sufficiently trustworthy under Rule 807.  "[T]he existence or absence of corroboration is relevant to, but not dispositive of, whether a statement should be admissible under [the residual hearsay] exception."  *Id.*

**(ii) Probative Value**

Rule 807's requirement that the interviews be "more probative on the point for which [they] are offered than any other evidence that the proponent can obtain through reasonable efforts" is also met.   Fed. R. Evid. 807.   The Government explains it will seek to admit the interviews if MF1 "becomes so anxious or intimidated that she is unable or unwilling to testify regarding her sexual abuse at the hands of the defendant."   ECF No. 36 at 6.   The Court agrees that under these circumstances, "[t]o the extent [MF1] is unable to remember the details of the abuse . . . the interview[s] will be more probative than any other evidence the government could procure on those points."   *Smith*, 2020 WL 5995100, at *12; *see also Burgess*, 99 F.4th at 1187 (upholding admission of hearsay under Rule 807 where the child witness's in-court testimony was inconsistent); *Wandahsega*, 924 F.3d at 882 (same, where the only detail the child witness was able to provide was that the defendant had touched his privates more than one time); *United States v. Peneaux*, 432 F.3d 882, 893 (8th Cir. 2005) (same, where the child witness's in-court testimony was "hesitant" and "inconsistent and at times unclear"); *Harrison*, 296 F.3d at 1007 (10th Cir. 2002) (same, where the child witness recanted her prior allegations of abuse).

The Court notes that if the Government offers the statements through Canipe's testimony without showing the videos in their entirety, the Court will permit McCaffrey to play the videos in their entirety in his case if he wishes.

## B. The Confrontation Clause

The Confrontation Clause of the Sixth Amendment to the United States Constitution provides that the accused has a right to confront and cross-examine the witnesses against him.  The Government argues that "the Confrontation Clause will be satisfied in this case because the declarant, MF1, will actually appear in court and testify in person."  ECF No. 36 at 9.  McCaffrey did "not address the Confrontation Clause issues because the Government has advised that [MF1] will testify."  ECF No. 42 at 4.

The Confrontation Clause applies not only to testimony in court but also to out-of-court statements introduced at trial.  *See generally Crawford v. Washington*, 541 U.S. 36 (2004); *see also Melendez-Diaz v. Massachusetts*, 557 U.S. 305, 310-11 (2009) (laboratory analysts' certificates regarding drugs found on Defendant were admissible only if analysts were available for cross-examination at trial).  "The Confrontation Clause guarantees only an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish."  *United States v. Owens*, 484 U.S. 554,

559 (1988) (emphasis in original) (internal marks and citations omitted).  If MF1 is available for cross-examination, introduction of her forensic interviews will not violate the guarantees of the Confrontation Clause.  If MF1 is unwilling or unable to be available for cross-examination at trial, the Court "will then have the necessary information before it to analyze whether the Confrontation Clause's demands have been satisfied."  *United States v. Counts*, No. 3:18-CR-00141, 2020 WL 598526, at *3 (D.N.D. Feb. 7, 2020).

## II.     Rule 801(d)(1)(B)(ii)

Rule 801(d)(1)(B)(ii) provides that a declarant-witness's prior statement may be introduced if "[t]he declarant testifies and is subject to cross-examination about a prior statement and the statement . . . is consistent with the declarant's testimony and is offered . . . to rehabilitate the declarant's credibility as a witness when attacked on another ground."  McCaffrey argues that the Government's motion on these grounds is not ripe for decision.  The Court agrees.

As a general matter, the Government may introduce MF1's prior forensic interview statements if they are "consistent with [her] testimony," and offered "to rebut an express or implied charge that [she] recently fabricated [it] or acted from a recent improper influence or motive in so testifying" or "to rehabilitate [her] credibility as a witness when attacked on another ground." Fed. R. Evid.

801(d)(1)(B).  *See, e.g.*, *United States v. J.A.S., Jr.*, 862 F.3d 543, 545 (6th Cir. 2017); *United States v. Espinoza*, 684 F.3d 766, 781-82 (8th Cir. 2012).  The Court defers ruling on the Government's motion until such time as McCaffrey attacks MF1's testimony.  At that point, the Court will decide whether the prior statements the Government wishes to introduce are consistent with MF1's testimony and offered for a proper purpose.

### III.   Reasonable Accommodations

The Government requests that MF1, who will be seven years old at the time of trial, be permitted to have a comfort object such as a doll, stuffed animal, stress relief ball, or other stress relief item.  McCaffrey objects.  He is concerned that the items will distract the jurors, give them additional sympathy for MF1, and give the appearance that the Court believes MF1's allegations and allowed her special accommodations for that reason.

Many courts have permitted such accommodations for child witnesses.  *See, e.g.*, *United States v. Foard*, No. 8:20-CR-333, 2022 WL 9441373, at *1 (D. Neb. Oct. 14, 2022) (allowing minor victim to testify with cat stuffed animal) (collecting cases); *Counts*, 2020 WL 598526, at *4 (allowing eleven-year-old child witnesses to hold small foam stress relief balls while testifying); *see generally* Fern L. Kletter, *Propriety of Allowing Witness to Hold Stuffed Animal, Doll, Toy or Other Comfort*

CASE NO. 3:24cr11/MCR

*Item During Testimony*, 82 A.L.R.6th 373 (2013) ("Many courts have allowed vulnerable witnesses to bring a comfort item with them while they testify.").

The Court finds the requested accommodations reasonable and permissible and will take various measures to mitigate McCaffrey's concerns.  Federal Rule of Evidence 611(a) instructs courts to "exercise reasonable control over the mode . . . of examining witnesses . . . so as to . . . make those procedures effective for determining the truth."  The Court finds that the use of a doll, stuffed animal, or stress relief ball would cause minimal distraction to the jury and serve the important function of garnering truthful and complete testimony from MF1.  To minimize potential prejudice to McCaffrey, the Court will ensure that MF1 is in the witness stand along with the comfort objects before the jury enters the courtroom.  *See Gomez v. State*, 25 A.3d 786, 799 (Del. 2011) ("Here, the trial judge recognized that permitting S.C. to walk to the witness stand [with a teddy bear] in the presence of the jury might unduly elicit sympathy.  It appears that the trial judge addressed that risk and properly provided for S.C. to walk to the witness stand before the jury entered the courtroom.").  The Court will also ensure that the jury leaves the courtroom before MF1 leaves the witness stand.

To address McCaffrey's concern that the jury will conclude from the comfort items that the Court believes MF1's allegations, the Court will consider at time of

trial whether to instruct the jury that the presence of the comfort items is not indicative of the truthfulness or falsity of MF1's testimony.

Separately, the Court notes that Federal Rule of Evidence 603 provides that a witness's oath "must be in a form designed to impress that duty on the witness's conscience."  Accordingly, before MF1 testifies, the Court will establish that she appreciates the difference between truth and falsehood, understands that lying is wrong and carries serious consequences, and promises to tell the truth.  This will replace the Court's standard witness oath.  *See Knappenberger v. Ludwick*, No. 09-CV-10962, 2012 WL 683455, at *6 (E.D. Mich. Mar. 2, 2012) (determining upon review of § 2254 writ of habeas corpus that colloquy between court and six-year-old witness sufficient to swear in witness under Sixth Amendment); *United States v. Lamere*, 337 F. App'x 669, 671 (9th Cir. 2009) ("[T]here is no constitutionally or statutorily required form of oath." (citation omitted)); *United States v. Thai*, 29 F.3d 785, 811-12 (2d Cir. 1994) ("When children testify, the trial court may fashion an oath or affirmation that is meaningful to the witness." (citation omitted)).

## Motion *in Limine* 2 (ECF NO. 37)

The Government moves to preclude McCaffrey from introducing his own prior statements to law enforcement officers or others without taking the witness

stand, even if the Government introduces McCaffrey's prior statements pursuant to Federal Rule of Evidence 801(d)(2)(A), which allows a party to introduce an opposing party's out-of-court statement.  McCaffrey has not responded and thus the Court assumes McCaffrey is not intending to introduce his prior self-serving statements.

**DONE AND ORDERED** this 10th day of July 2024.


*M. Casey Rodgers*
**M. CASEY RODGERS**
**UNITED STATES DISTRICT JUDGE**

CASE NO. 3:24cr11/MCR